Filed 1/30/26  P. v. Brzezinski CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D084282 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE413303) |
| LEONARD J. BRZEZINSKI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Lisa R. Rodriguez, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene Sevidal, Assistant Attorney General, Stephanie Chow and Elana Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Leonard J. Brzezinski appeals from a judgment imposed against him after a jury convicted him of several felony and misdemeanor counts arising from two separate domestic violence incidents.  He argues

that he received ineffective assistance of counsel and that the trial court committed instructional error. We conclude that even assuming any deficient performance by counsel or instructional error, Brzezinski has demonstrated no prejudice. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Brzezinski and C.B. got married in 2020 and lived together in Jamul. They had no children together, but C.B. had two daughters from a previous marriage to L.W.

A.    *Uncharged January 2022 Incident*

Witness J.B. said that in January 2022, she was waiting in line at a COVID-19 testing location in Chula Vista when she observed commotion in a nearby car.[1] She saw and heard Brzezinski yelling and being "very aggressive" towards C.B. in the car, putting his hand or arm on her neck. C.B. appeared to be sitting still, like she had "lost a fight or something" and "gave up." After J.B. approached the car and told Brzezinski to let C.B. go, he told J.B. to "mind [her own] business." J.B. told others nearby who also heard the commotion to call the police. Brzezinski got out of the car, removed the keys from the ignition, took a backpack from the trunk, and walked up a nearby hill. A police officer arrived and took a statement from J.B., but the officer said C.B. did not seem to want to talk to him and he observed no visible injuries on C.B.

---

[1]    Testimony regarding this incident was admitted pursuant to Evidence Code section 1109, which provides that in a criminal action for an offense involving domestic violence, under certain circumstances evidence of a defendant's commission of other domestic violence may be admissible. (Evid. Code, § 1109, subd. (a)(1).)

*B. May 2022 Incident*

Deputies Gimeno and Campagna responded to a call from C.B. at her Jamul residence in May 2022. Deputy Gimeno testified at trial that when they arrived, C.B. was upset, crying, and seemed afraid. Her nose also looked broken, red, and "very crooked."

Deputy Gimeno's body-worn camera footage showed C.B. telling the officers that Brzezinski headbutted her and she thought he broke her nose, but she declined medical assistance and did not want the officers to take photos of her injuries. C.B. acknowledged that she had called 911 earlier in the day but was too afraid of Brzezinski to say anything when the officers first responded. When Deputy Campagna pointed out an injury on C.B.'s ankle, she said it was an "old" one and showed him a different part of her ankle, saying that was "the new one." C.B. said Brzezinski had kicked her there, although Deputy Campagna's opinion was that the redness on C.B.'s ankle was consistent with a door being slammed on it, not with being kicked. C.B. told officers that Brzezinski had "a lot" of guns and knives. When the officers asked C.B. whether she thought Brzezinski would cooperate when they attempted to arrest him, she said that he and his father would say she "caused all this" and that Brzezinski would try to "smooth it all" over and "act like he's . . . the sweetest man that you ever met."

An April 2022 criminal protective order was in effect at the time of the incident naming Brzezinski as the restrained party and C.B. as the protected party.

*C. July 2022 Incident*

C.B. called L.W., her former spouse, on the evening of July 16, 2022. L.W. testified at trial that she sounded distraught and told L.W. she needed help because Brzezinski was abusing her. L.W. called 911, then called the

3

landline at C.B.'s residence. Brzezinski answered briefly and sounded "out of sorts" and "not really comprehensible" before he hung up on L.W.

When Deputy Gimeno arrived at the residence in response to the call, C.B. was at the bottom of the driveway. C.B. seemed "very lethargic," "a little bit confused," and a "little bit scared." Brzezinski was halfway down the driveway coming towards them, removing a knife he had on his person. Deputy Gimeno noticed bumps and bruises on C.B.'s face and bald spots on her head. Brzezinski said that C.B. was "hammered" and had just fallen down a hill, but C.B. told the deputy that Brzezinski had beaten her, and she thought her hand might be broken. C.B. reported that Brzezinski had also pistol-whipped her in the head and strangled her. After noting that C.B.'s injuries were consistent with her statements, Deputy Gimeno arrested Brzezinski. When she searched his person incident to the arrest, she discovered a gram of methamphetamine in his pocket. He also had both his and C.B.'s cell phones in his possession.

L.W. said C.B. did not sound inebriated when she called him. Deputy Gimeno also observed that C.B. did not appear to be under the influence of alcohol, and she did not smell alcohol on her. When asked if she had been drinking, C.B. said she had refrained "because she was with her kids."

Deputy Gimeno's body-worn camera footage from that night recorded C.B. telling the deputy that when she first got home from being out with her daughters, Brzezinski was "kind of pissy, but he wasn't raging." C.B. said that Brzezinski "always thinks that [she's] cheating on him" and that "it's been the same thing since we first met." When Brzezinski came back from the store, "he came raging around the corner" and "just threw [C.B.] on the ground." He began kicking and hitting C.B. in the leg and stomach and used a fishing pole to whip her. He also dragged her into the house by her hair

4

and hit C.B.'s head against the refrigerator.  C.B. noted there were clumps of her hair "all over the floor of the house."  Deputy Gimeno also felt a bump on the back of C.B.'s head.  C.B. lost count of how many times Brzezinski hit her in the head with a gun, but she estimated "10, 20" times.  C.B. gave Deputy Gimeno permission to search the premises for the gun, but she did not find one.

C.B. called L.W. the next day and told him about what had happened the day before.  She said Brzezinski came back from a trip to a hardware store, got out of the car, and started screaming at C.B.  Brzezinski tackled C.B. to the ground and dragged her into the garage, where she said he tortured her for three to four hours.  He accused her of cheating on him, and when C.B. denied it, Brzezinski hit her with the butt of a gun, his fist, and his feet.  C.B. told L.W. that Brezinski also threatened to shoot her in the back if she tried to escape.  She was able to get away briefly and ran up a hill barefoot, but Brzezinski found her and dragged her back into the garage.  He zip-tied her hands behind her back and jumped on her back until she lost consciousness.  L.W. said C.B. sounded "distraught, broken down, [and] afraid" when she recounted the events, and she expressed fear that Brzezinski would kill her if he got out of jail.

C.B. also went to the hospital the day after the incident and sent Deputy Gimeno several photos showing bruises, bumps, swelling, and a laceration on her face, as well as a black eye.  C.B. sent photos showing clumps of hair missing from her head, along with pictures of her swollen right hand.  She also showed the deputy photos of redness, bruising, and lacerations on her arms and legs.

Deputy Gimeno took photos of C.B.'s injuries when she visited C.B. at her residence the day following the incident.  Those photos showed bruises

5

near C.B.'s upper chest and collarbone and scratches on her back. The deputy's photos also showed a bullet hole in the door of a refrigerator in the garage and a bullet inside the refrigerator, which C.B. explained came from Brzezinski shooting into the refrigerator after he dragged her there. During that visit, Deputy Gimeno found unused zip ties in the garage and two boxes of ammunition under a bed.

Deputy Gimeno returned to C.B.'s house a few days after that on July 21, 2022, after C.B. texted her to say she found a bullet casing in the garage. The deputy's body-worn camera footage from that visit showed C.B. discussing zip ties, a fishing pole, and a knife that C.B. said Brzezinski used during the incident. She told Deputy Gimeno that Brzezinski held a knife to her throat the night of the incident, but she only recalled that it had happened when she saw the knife in the garage. She stated multiple times that she was not drinking "at all" that night because she was with her children, and was also not under the influence of drugs. But she had trouble remembering the sequence of events because it went on for "so long, and [in] so many different places."

Deputy Gimeno then began asking C.B. questions while filling out what she described as "domestic violence paperwork." When responding to the deputy's questions, C.B. said that her hand was fractured and that she had "cuts all over [her] body." She said Brzezinski strangled her with two hands until she blacked out after she pleaded with him to "just . . . shoot [her] and kill [her]." She woke up on the floor and described her voice as being "scratchy" and her whole body feeling "tingly and weird." According to C.B., Brzezinski seemed "psychotic" and threatened to beat C.B. to death until she "told the truth." C.B. said she thought she was going to die while he was

strangling her, but that it would be "an easier way to go than what [Brzezinski] had been doing."

For approximately four minutes towards the end of the conversation, Deputy Gimeno asked C.B. about Brzezinski's criminal history and other occasions in which he had acted violently towards her. C.B. said that Brzezinski had strangled her on about 15 or 20 other occasions, had threatened her in the past, had been arrested before, had a criminal history, and had a history of domestic violence towards her. She also reported that he expressed jealousy or ownership over her, controlled her activities, and isolated her from family and friends.

*D.  Post-Arrest Jail Calls*

The jury heard a series of recorded jail calls between C.B. and Brzezinski after his arrest that occurred between July 18, 2022, and August 1, 2022.

1. July 18, 2022 Calls

On July 18, 2022, C.B. said that she and "everyone involved" were "pushing" for a longer sentence for Brzezinski.  He asked, "So you're going to try and put me away for life?"  C.B. responded, "Yeah.  I lost my kids because of you."  She also said, "I fucking nearly lost my life because of you. . . .  Because you told me the whole time you're going to kill me."  When Brzezinski denied doing so, C.B. said that the only reason he left her alive was because she "fucking lied" and falsely told him she had cheated, which she described as "the correct story" that he wanted to hear.  She told him she had no choice and "[i]t was either that or die" because Brzezinski was "going to kill [her]."  When Brzezinski accused C.B. of hating him, she responded that "the sick part is that even after all of this I still don't hate you."  Brzezinski told C.B. that she was "not the only victim."

Later in the call Brzezinski told C.B., "I am sorry for everything that's happened; I'm sorry that you had to take me to that point and I'm sorry that I had to go to that point.  I'm sorry . . . that I wasn't man enough to walk away."  C.B. said, "I had to beg you for my life. . . .  You have no idea what you put me through -- for those hours."  Brzezinski responded, "I know exactly what I put you through."  He went on to say, "[W]ith all the stuff that I asked you about and yet . . . you still refused to tell me the truth and lie to me about it."  He told C.B., "I wanted to call you to tell you that I wish you well, that I love you, that I miss you, and that I'm always thinking about you."  When he accused her again of being untruthful about "the same

8

bullshit," C.B. said, "I got beat for hours because I wasn't going to admit to something that I didn't do.  And when I . . . woke up after you . . . strangled me and I woke up on the floor and I was scared out of my fucking mind . . . Then I started telling you your story. . . .  Because I feared for my fucking life."

Brzezinski called C.B. from jail later that day and told her he missed her and loved her.  He said he was "sorry for everything [they had] been through[.]"  In response, C.B. recounted that he held a knife to her throat, zip-tied her, jumped on her back, and "whipped" her.  He initially denied doing those things, but after she listed her injuries and said "[t]hese are all things that you did to me[,]" he said: "Okay, well [C.B.], you've done plenty to me too."  He also said he had "done those things to someone who [he] claim[ed] to hate at the time because she was lying to me."

## 2. July 23, 2022 Calls

Brzezinski called C.B. from jail again on July 23, 2022, and asked C.B. what "the plan here" would be. He called his charges a "charade" and said he believed the prosecution did not "have any evidence" to support them. When C.B. said, "It's not a charade what you did to me[,]" Brzezinski told her, "I love you to death, but what you did to me was wrong too." C.B. denied cheating on him and said that she went through three hours of him torturing her. He told C.B. she "took a fuckin' header down a mean-ass hill," and she replied: "That didn't hurt me . . . you know what hurt like hell? Is what you did to me[.]" He apologized again and said he would not "talk about anything over the phone," but then later said he did not intend to put C.B. "in no fuckin' grave over this bullshit" and just "wanted [C.B.] to accept" that she "did wrong." Brzezinski wondered why she did not just admit to infidelity at the beginning of the incident.

After time expired on that call, Brzezinski called C.B. again. When C.B. repeated that she had "almost lost [her] life over" his belief she was cheating, Brzezinski said, "I wasn't gonna take it that far. I'm a little fuckin' more professional than that. And yeah, maybe I did have a psychotic break, but guess what? So have you."

### 3. July 26, 2022 Calls

During calls to C.B. on July 26, 2022, Brzezinski said he did not want to be in jail anymore, expressed his love for her, and said that C.B. did not have to testify against him and could "do the same thing [she] did last time" and send an e-mail so he could "get the fuck out." He said he was "smoking methamphetamine" and "drinking way too much." He told C.B. that she did not have to testify against him and asked for her help keeping him out of prison.

In a second call, Brzezinski told C.B. that L.W. was to blame for their problems because he called the police and was illegally coercing C.B. with the threat of losing custody of her children. Brzezinski told C.B. multiple times to ask that charges be dropped, to tell the prosecution she would not participate in the case, and to speak to his attorney.

Brzezinski called a third time that day and pressed C.B. again to "show up in court tomorrow" for him and talk to his attorney, or else he would "end up fucked[.]" He told her, "you've got to get me out of this mess pretty quick" because "if some of these charges don't [get] dropped, I'm fucked. . . . I don't mean fucked like doing time, fucked, I mean fucked." He said he could not explain what that meant over the phone, but that he would talk to his father and have him explain it to C.B. He referenced having problems with "the white boys" after being transferred to another detention facility. Then Brzezinski again proposed that C.B. tell his lawyer that "this [was] all [L.W.'s] doing" and that they "were drinking a little bit that night[.]" C.B. asserted that she "wasn't even drinking that night" and that they only "had one shot" by the pool. Brzezinski eventually said, "Fine you weren't, fine you weren't drinking, okay." But he again insisted that she talk to his lawyer and put all the blame for the incident on L.W.

11

### 4. July 27, 2022 Calls

When Brzezinski called the next day, he insisted that C.B. talk to his attorney's investigator and tell him about L.W. because if not, then Brzezinski was "not coming home." He said that the prosecution would not drop charges even if C.B. refused to testify, so she would need to testify affirmatively on his behalf and "make sure you say that the reason you told them anything at all is because [L.W.] made you; that he threatened you with the kids." Brzezinski said he would be "fighting for [his] life here pretty quick" if they "don't get this shit taken care of" and that she should tell the prosecution she lied to keep L.W. from taking custody away from her. C.B. asked, "How am I gonna . . . explain away the hospital?"

### 5. July 29, 2022 Calls

C.B. told Brzezinski on July 29, 2022, that she was no longer cooperating with the prosecution and that she was planning to talk to his attorney's investigator. She then asked, "What if I just said that everything was a lie and then . . . what you said happened, that I was hammered, and I fell down the hill?" Brzezinski responded that it "would clear everything up probably" and warned that the prosecution "might try to seek charges against you, but they would be misdemeanor charges" and she "wouldn't do any time."

### 6. August 1, 2022 Call

In a call a few days later on August 1, 2022, Brzezinski told C.B. she had to get him out of jail quickly and that he was "wondering if [she's] in on all this shit" and "setting [him] up." He referenced having to take action about matters in jail "within the next seven days" and having to "nut the fuck up in here[.]"

### E.    *Additional Trial Testimony*

1. <u>C.B.'s Testimony</u>

At trial, C.B. recanted most of her prior statements and gave a different account of what happened during the January, May, and July 2022 incidents.

Regarding the January 2022 incident at the COVID-19 testing site, C.B. said she recalled driving the car that day with Brzezinski in the passenger seat. When they were driving up a hill in Chula Vista, she said "someone on the street started screaming." At one point, Brezinski pulled the emergency brake while the car was in drive, which led to an argument in which he and C.B. were screaming at each other. Around this time J.B. "ran up to the window and started screaming" about Brzezinski "hitting" and "punching" C.B. J.B. also went "into this long spiel about how her mother was abused, and she was crying." C.B. said she found the whole situation "very strange" because Brzezinski had not put his hands on her.

As for the May 2022 incident when officers were called to her home, C.B. testified that Brzezinski accidentally headbutted her when they both reached down at the same time to pick up a dropped cigarette. She said that her nose was not broken that day, but rather had "been broken since [she] was 13 years old," and that she only accused Brzezinski of breaking her nose because they were arguing. After Brzezinski told her he was going to call the police, C.B. decided to call the police herself after he left their house. C.B. did not recall telling the police she was afraid of Brzezinski or that he had kicked her in the ankle.

C.B.'s account at trial of the July 2022 incident was that she hurt herself when she and Brzezinski were using a hydraulic jack to attempt to lift and level their outdoor pool. According to C.B., a piece of wood came loose during that process, struck her in the face, and caused her to tumble

13

downhill, hitting boulders and rocks along the way. C.B. said she was very drunk that night and Brzezinski helped her back up the hill and into the house. She denied telling L.W. that Brzezinski was abusing her, and said she lied to the deputies because she was upset with Brzezinski and thought ending their relationship would help her retain custody of her children. She also testified that she could not remember much of what she said that night because of how much alcohol she drank.

C.B. expressed her love for Brzezinski and said she felt "a lot of guilt and remorse" for "put[ting] him behind bars." She had "gone hundreds of times" to see Brzezinski while he was in custody and wanted to stay married.

2. Expert Testimony

Cecelia Markland, an investigator at the district attorney's office, testified as an expert on intimate partner violence and its effects. Markland first testified about different phases in the "cycle of violence," which she explained is a pattern describing how certain behaviors fit into one of three categories: the acute event or "explosion," the "honeymoon" phase, and the tension-building phase.

Markland first discussed each phase in the abstract and gave general examples of the behaviors that could occur in each. For example, in the acute explosion phase, typically there is a violent event leading the victim or a bystander to involve the police. The second honeymoon phase is often characterized by the abuser apologizing, minimizing or denying behavior, declaring love, and promising it will not happen again. Markland explained that in the next tension-building phase, the victim ends up "walking on eggshells" and might experience the abuser breaking things, yelling, being moody, nitpicking, name-calling, or making everything that goes wrong seem

14

like the victim's fault, until an acute explosion happens and the cycle begins again.

Markland testified that in her past work, she has seen this cycle play out when victims decide not to press charges in the honeymoon phase, or when victims recant or minimize the abuser's behavior. She said "a lot of times it's arguments over infidelity" that trigger the acute explosion. But victims of domestic violence stay in the relationships for various reasons, including financial need, shame, or the belief that the violence will not recur.

The next portion of Markland's testimony focused on the recorded jail calls between C.B. and Brzezinski. After playing each of the calls, Markland discussed how the conversation was consistent with different phases in the cycle of violence. For example, she identified ways in which Brzezinski minimized what happened, blamed C.B., and made threats. But when Brzezinski later expressed his affection and love for C.B., apologized, and talked about getting sober, Markland testified that those actions "align[ed] with the honeymoon stage[.]"

Markland responded to hypotheticals posed by the prosecutor about how people in relationships involving domestic violence may behave, including why a victim might stay married to their abuser or why they may recant later. Markland also explained how Brzezinski exercised "power and control" over C.B. by telling her what to say and do, manipulating her feelings, and talking about bad things happening if she did not act in the way he wanted.

3. Medical Treatment Provider's Testimony

Dr. Michael Holman, the emergency room physician who treated C.B. the day after the July 2022 incident, testified that during intake C.B. said she was seeking treatment after being assaulted by her husband. She

15

reported that he hit her with a firearm, zip-tied her, and kicked her over a prolonged period of time lasting about four hours. Dr. Holman recalled that C.B. seemed upset while she was describing what happened, and according to his notes, she seemed to have difficulty recalling events, which is consistent with head injury. He noted that she had visible abrasions and contusions on her face, arms, and right hand, but CT scans showed no evidence of fractures or intracranial injury.

## F. Trial Court Proceedings

The People charged Brzezinski with torture (Pen. Code,[2] § 206 [count 1]); corporal injury to a spouse (§ 273.5, subd. (a) [count 2]); assault with a firearm (§ 245, subd. (a)(2) [count 3]); criminal threats (§ 422 [count 4]); false imprisonment by violence (§§ 236 & 237, subd. (a) [count 5]); possession of a firearm by a felon (§ 29800, subd. (a)(1) [count 6]); possession of ammunition by a prohibited person (§ 30305, subd. (a)(1) [count 7]); violation of a protective order (§ 166, subd. (c)(1) [count 8]); possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a) [count 9]); corporal injury to a spouse (§ 273.5, subd. (a) [count 10]); violation of a protective order (§ 166, subd. (c)(1) [count 11]); and attempting to dissuade a witness from testifying (§ 136.1, subd. (a)(2) [count 12]). Counts 1 through 9 related to the July 16, 2022 incident, counts 10 and 11 were related to the May 5, 2022 incident, and count 12 was based on the jail calls.

The People also alleged that Brzezinski personally used a firearm (§ 12022.5, subd. (a)) during the commission of counts 1 through 4 and that he personally inflicted great bodily injury (§ 12022.7, subd. (e)) during the commission of counts 1 through 5 and 10. The information further alleged

---

[2] Undesignated statutory references are to the Penal Code.

16

Brezinski suffered two serious felony priors (§ 667, subd. (a)(1)) and two strike priors (§§ 667, subds. (b)-(i); 1170.12).

The jury convicted Brzezinski as charged in counts 1, 2, and 4 through 12. The jury convicted him of the lesser included offense of simple assault in count 3. The jury found the personal use of a gun allegation to be true for count 4 (criminal threats), but not for any other counts. The jury also found the great bodily injury enhancement to be true for counts 1, 2, and 4 based on the July 16, 2022 incident, but not count 10, which was based on the May 5, 2022 incident. Brzezinski admitted the alleged priors.

In June 2024, the trial court sentenced Brzezinski to a term of 14 years to life, plus 10 years in state prison.

DISCUSSION

I

Brzezinski argues that he received ineffective assistance of counsel at trial because his attorney failed to object to: (1) Markland's improper opinion testimony; (2) the playing of the entirety of Deputy Gimeno's body-worn camera footage from her July 21, 2022 visit to C.B.; and (3) the admission of C.B.'s statements to Dr. Holman as improper expert and lay opinion testimony. We address each in turn.

To prevail on his ineffective assistance of counsel claims, Brzezinski must establish that (1) his counsel's performance was deficient, and (2) he was prejudiced as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) Deficient performance is established by showing that the attorney's representation "fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) Under *Strickland*'s prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

In deciding a claim of ineffective assistance of counsel, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland, supra*, 466 U.S. at p. 697.)

We take that course here. Brzezinski first argues that his counsel should have objected to Markland's testimony applying a cycle of violence analysis specifically to C.B. and Brzezinski. He contends it was improper for Markland to go beyond merely rebutting general misconceptions about domestic violence and instead characterize particular statements made by Brzezinski and C.B. But even assuming any deficient performance, we conclude Brzezinski has not demonstrated a reasonable probability that the outcome would have been different if his counsel had successfully objected to those portions of Markland's testimony. Brzezinski acknowledges in his opening brief that Markland's explanation of the cycle of violence was permissible under Evidence Code section 1107, which allows for expert testimony "regarding intimate partner battering and its effects" in cases like these. Markland testified at length, often with the use of hypotheticals and abstract statements which mirrored the underlying facts, about how a perpetrator of domestic violence might cast blame on the victim, persuade the victim to recant, and otherwise manipulate them. Even if Markland had not

expressly applied the cycle of violence phases to Brzezinski and C.B.'s situation, the jurors would easily have made those connections themselves.

Moreover, the jury heard and read transcripts of the lengthy jail calls described above, the admissibility of which Brzezinski does not challenge on appeal. On multiple occasions in those calls, Brzezinski admitted he harmed C.B. even while casting blame on her. For example, after C.B. repeatedly accused him of nearly killing her, he said, "I'm sorry that you had to take me to that point and I'm sorry that I had to go to that point. I'm sorry . . . that I wasn't man enough to walk away." When C.B. recounted how Brzezinski held a knife to her throat, zip-tied her, jumped on her back, and whipped her, he eventually said, "Okay, well [C.B.], you've done plenty to me too." He also attempted to excuse his behavior by saying he had "done those things to someone who [he] claim[ed] to hate at the time" because he believed C.B. was lying to him. He said he did not intend to kill C.B. but wanted her "to accept" that she "did wrong" and wondered why C.B. did not just admit to cheating at the beginning of the incident. In another damning exchange, he told C.B. her life was not actually at risk because, as he said, "I wasn't gonna take it that far. I'm a little fuckin' more professional than that. And yeah, maybe I did have a psychotic break, but guess what? So have you."

The jury also heard Brzezinski and C.B. describe in detail during those jail calls how C.B. could lie on his behalf. Brzezinski pleaded with C.B. not to testify against him, citing concerns about being harmed in jail. He told C.B. to blame L.W. for what happened and insisted that she say she was drunk the night of the July 2022 incident, even though they both acknowledged she only had "one shot." C.B. even admitted that she could say "everything was a lie" and then use the story Brzezinski proposed, saying she "was hammered" and "fell down the hill[.]"

19

Moreover, in addition to hearing the jail calls, the jury also heard testimony from L.W., J.B., and Deputy Gimeno; saw body-worn camera footage from May 5, 2022 and July 16, 2022; and saw photos taken by Deputy Gimeno and by C.B. herself. Brzezinski raises no challenges to these categories of evidence on appeal, and they each support C.B.'s pre-trial account of what happened before she recanted. The totality of the evidence, including the unchallenged portions of Markland's cycle of violence testimony, make it impossible for us to conclude the allegedly inadmissible portions could have made a difference to the result.

"It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test . . . ." (*Strickland, supra*, 466 U.S. at p. 693.) "Prejudice must be a demonstrable reality established based on facts in the record, not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Tilley* (2023) 92 Cal.App.5th 772, 778.) Given the overwhelming weight of the evidence, Brzezinski cannot show prejudice as a demonstrable reality.

Brzezinski's remaining arguments fall short for similar reasons. He contends that he was prejudiced by his counsel's failure to object to portions of Deputy Gimeno's body-worn camera footage from a July 21, 2022 visit to C.B.'s residence in which C.B. described Brzezinski's prior acts of violence and aspects of his criminal history. These statements, Brzezinski argues, constituted negative character evidence prohibited by Evidence Code section 1101, subdivision (a). Again, even assuming counsel's performance was deficient in failing to object to the footage, Brzezinski cannot show a reasonable probability that the result of the proceeding would have been different. The portion Brzezinski challenges consists of only a few minutes

of footage.  He does not argue on appeal that any other portions of body-worn camera footage were inadmissible, which included C.B.'s statements to Deputy Gimeno in May 2022 about Brzezinski headbutting her.  Footage from the night of the July 2022 incident also recorded C.W. describing Brzezinski's abuse in detail, including that he threw her to the ground, kicked her, whipped her with a fishing pole, dragged her around by her hair, and hit her with a gun.  The unchallenged footage also showed C.B. repeatedly denying that she had been drinking that night, which contradicts C.B.'s testimony at trial.  This video evidence, along with the jail calls, witness testimony, and photographs about which Brzezinski has raised no issues on appeal, show there is no reasonable probability that the result of the proceeding would have been different even assuming counsel erred.

Lastly, Brzezinski contends he was prejudiced by his attorney's failure to object to the admission of C.B.'s statements to Dr. Holman because they could have been fabricated.  Brzezinski also argues that Dr. Holman improperly testified about the long-term effects of losing consciousness and loss of blood flow to the brain, which are subjects outside of his area of expertise.  Even assuming counsel's performance was deficient, as we have noted, there was ample other evidence supporting C.B.'s pre-trial account of what happened during the July 2022 incident, including recordings of C.B. herself.  Dr. Holman's testimony about C.B.'s description of the abuse was cumulative and there is no reasonable probability of a different result without it given the totality of the evidence.

Brzezinski also does not explain how Dr. Holman's brief testimony on the long-term effects of certain head injuries, which came in response to only two questions posed by the prosecutor, could have impacted the jury's considerations in a meaningful way.  Brzezinski makes the conclusory

21

assertion that because his defense was that C.B. hurt herself falling down a hill, Dr. Holman's testimony undercut his defense. But not only were the long-term effects of C.B.'s injuries peripheral to the primary issues in the case, it is unclear how the fact that C.B. suffered head injuries is inconsistent with Brzezinski's defense theory. We therefore reject Brzezinski's ineffective assistance of counsel claims.

## II

Brzezinski also argues that the trial court committed error because although the People charged him with a single count of making a criminal threat, there were at least two separate acts which could have constituted a criminal threat, and the court should have given a unanimity instruction. (See CALJIC No. 17.01.[3]) He contends that because the court did not instruct the jury sua sponte that they had to all agree on which specific act constituted the threat, the prosecution's burden of proof was lower than it would have been otherwise. We conclude that any error, if it occurred, was harmless under any standard of prejudice.

Both parties cite *People v. Diedrich* (1982) 31 Cal.3d 263 (*Diedrich*), which is instructive here. Diedrich was a public official convicted of bribery after the prosecution put on evidence of two separate instances that occurred during the applicable time period. (*Id.* at p. 280.) On one occasion, evidence suggested that Diedrich offered to help land developers with removing their parcel from an agricultural preserve if they were willing to purchase land owned by his friend over market price. (*Id.* at p. 268.) During the same

---

[3]     CALJIC No. 17.01 (4th ed. 1979) provides: "The defendant is charged with the offense of _____. He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

three-month period, the developers hired Diedrich's personal attorney for a substantial unjustified fee. (*Id.* at pp. 268–270.) A significant portion of the attorney's fee was eventually given to Diedrich or used for his benefit. (*Id.* at p. 272.) After a county vote in which Diedrich participated, the land developers successfully had their land removed from the agricultural preserve, allowing them to build on the parcel. (*Id.* at pp. 268–271.)

The People charged Diedrich with two counts of bribery, with the first count covering the three-month period during which the above two alleged instances occurred. At trial, Diedrich requested a unanimity instruction, but the court refused to give one. (*Diedrich, supra*, 31 Cal.3d at p. 280.)

The Supreme Court held that the trial court's refusal to give CALJIC No. 17.01 constituted error, and that the error was prejudicial. (*Diedrich, supra*, 31 Cal.3d at pp. 282–283.) In addressing prejudice, the court explained: "This is not a case where the jury's verdict implies that it did not believe the only defense offered. Diedrich's defenses differed[.]" (*Id.* at p. 283.) For the alleged quid pro quo regarding Diedrich's friend's land, the court noted that his defense "consisted of a simple denial" that a statement offering Diedrich's help in exchange for purchasing land was ever made. (*Id.* at pp. 272, 283.) The transactions with his attorney, however, were " 'explained,' " in that Diedrich argued his attorney was hired because of his merits as an attorney. (*Id.* at pp. 273, 283.) Because the proof for the land-purchase bribe essentially depended on the testimony of "a single immunized witness," and the proof of the bribery via Diedrich's attorney "was somewhat circumstantial," the court held it was "bound to conclude that the error was prejudicial." (*Id.* at pp. 282–283.)

We view this case as one in which the jury's verdict *does* establish that it did not believe the only defense offered. The parties do not dispute

23

that there is evidence Brzezinski made multiple statements during the July 2022 incident that could have constituted a criminal threat.  For example, as Brzezinski points out in his opening brief, there was testimony that Brzezinski threatened to shoot C.B. in the back if she tried to escape and that he would beat her to death until she "told the truth."  There was also evidence that after strangling C.B., Brzezinski asked her, "You wanna die?"  C.B. herself told Brzezinski in one of their recorded jail calls, "[Y]ou told me the whole time you're going to kill me."

But this is not a case in which the evidence to support each threat originated from a different victim, or arose in a separate context "where different items of real evidence were introduced to prove one act but not the other, so that the jury might have distinguished between the credibility of different witnesses or the weight to be given various items of real evidence." (*People v. Deletto* (1983) 147 Cal.App.3d 458, 466.)  In each instance noted above, C.B. was the singular source recounting Brzezinski's threats, and the jury had no basis upon which to credit only some of her characterizations of those threats but not others.  In other words, the jury had no basis upon which to conclude that one threat had been committed while another had not. (*Id*. at p. 467.)

The defense also did not differentiate between the acts in its cross-examinations or in closing argument.  During her cross-examination of the prosecution's witnesses, Brzezinski's attorney asked questions about the severity of C.B.'s injuries, C.B.'s motives to lie to law enforcement, and potential inconsistencies in C.B.'s pre-trial statements and other witnesses' testimony—none of which were specific to the alleged threats.  Defense counsel argued in closing that there was insufficient evidence to support any of the allegations, and that the jury should credit C.B.'s trial testimony over

24

her earlier statements to witnesses, on camera, and in jail calls. To argue that point, the defense primarily focused on how C.B.'s physical injuries were inconsistent with her earlier account of what happened. Even when Brzezinski's attorney did refer to firearms or ammunition, it was not to argue about the role a gun may have played in making a criminal threat. In fact, Brzezinski's counsel made no mention whatsoever of threats in her closing argument.

Brzezinski's defense therefore amounted to a simple denial that he caused C.B. harm at all. Even under the more stringent *Chapman*[4] standard of prejudice, any error from the absence of a unanimity instruction as to the criminal threats count was harmless beyond a reasonable doubt because " 'the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that [the] defendant committed all acts if he committed any[.]' " (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 577 (*Hernandez*).)[5] And as the Court of Appeal in *Hernandez* explained, "where the defendant offered the same defense to all criminal acts, and 'the jury's verdict implies that it did not believe the only defense offered,' failure to give

_____

[4]    *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

[5]    There is a split of opinion in the appellate courts as to whether the *Chapman* standard or *Watson* standard for harmless error applies in a unanimity instruction case. (See *Hernandez, supra,* 217 Cal.App.4th at p. 576 [noting conflicting authorities]; compare *People v. Watson* (1956) 46 Cal.2d 818, 836 [requires assessing whether it is reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred] with *Chapman*.) "The majority of the courts that have addressed the issue have applied *Chapman*." (*Hernandez*, at p. 576.) We need not decide which standard should apply here because we conclude any error was harmless under either standard.

a unanimity instruction is harmless error." (*Ibid.*, quoting *Diedrich, supra*, 31 Cal.3d at p. 283.) "The error is also harmless '[w]here the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence . . . .' " (*Hernandez,* at p. 577, quoting *People v. Thompson* (1995) 36 Cal.App.4th 843, 853.) Here, the jury heard Brzezinski and C.B.'s own pre-trial admissions regarding the July 2022 incident, in addition to the myriad other pieces of evidence supporting conviction. In finding Brzezinski guilty of 11 out of 12 counts as charged and finding him guilty of a lesser included offense on the remaining count, we conclude that the jury rejected Brzezinski's only defense and resolved the inconsistencies between C.B.'s pre-trial statements and her recantation at trial in the prosecution's favor. Accordingly, we affirm.

DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

RUBIN, J.